**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ARTHUR BEKKER, individually and on behalf of a class of all other persons similarly situated, and on behalf of the Neuberger Berman Group 401(k) Plan,

       Plaintiff,

 v.

THE NEUBERGER BERMAN GROUP LLC 401(k) PLAN INVESTMENT COMMITTEE and JANE AND JOHN DOES 1–25,

       Defendants.

---

Civil Action No. 1:16-cv-06123-LTS-BCM

**CLASS ACTION**

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**

JURY TRIAL DEMANDED

## I.  INTRODUCTION

1.  Plaintiff Arthur Bekker ("Plaintiff"), individually and on behalf of a class of similarly situated participants in the Neuberger Berman Group 401(k) Plan (the "Plan"), and on behalf of the Plan, brings this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the Neuberger Berman Group LLC 401(k) Plan Investment Committee and its members during the proposed class period ("Jane and John Does 1–25").

2.  Neuberger Berman Group LLC ("Neuberger") is the Plan sponsor.

1

3.      Plaintiff brings this action by and through his undersigned attorneys based upon his personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations in this Complaint.

## II.    NATURE OF THE ACTION

4.      The ERISA fiduciary obligations of retirement plan fiduciaries to the participants and beneficiaries of a plan are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *accord Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

5.      When selecting investments for a retirement plan, plan fiduciaries are required to: act with undivided loyalty; prudence; and defray reasonable plan expenses. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

6.      In addition, ERISA prohibits certain transactions and arrangements that have a high potential for abuse. Thus, ERISA prohibits a fiduciary from causing a plan to transact with a party in interest, such as the plan sponsor, and prohibits plan fiduciaries from causing plan transactions for the benefit of themselves or others. ERISA § 406(a)–(b), 29 U.S.C. § 1106(a)–(b).

7.      Defendants, who are or were fiduciaries to the Plan during the Class Period, have violated their fiduciary duties and engaged in prohibited transactions with Plan assets.

8.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing Plan investments. The individual Defendants were officers or employees of Neuberger or an affiliated entity. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries in managing the Plan's assets, the Defendants acted for the benefit of Neuberger—and one of its shareholders in particular—by forcing the Plan into a fund managed by Neuberger or an affiliated entity, the Value Equity Fund (the "Fund" or "VEF"), which charged exorbitant fees, benefiting Neuberger, its shareholders, and the Fund's portfolio manager.

9.     The VEF has suffered from consistently abysmal performance. Nevertheless, in 2011 Defendants opened the Fund to new investments and have maintained the Fund in the Plan despite its high fees and persistent and increasing underperformance compared to many plausible, available alternatives in the market. The decision to offer the Fund, and to open the Fund to new investments, were fiduciary breaches which cost the Plan and its participants over $130 million.

10.     The Fund is managed by Marvin Schwartz. Schwartz is a Managing Director at, and significant shareholder of, Neuberger. Schwartz's division, called the Straus Group, manages a significant percentage of Neuberger's total assets under management. As of 2002, Schwartz himself managed nearly 10% of Neuberger's entire portfolio. Because Neuberger is owned by its investment managers and other high-level employees, Plaintiff believes Mr. Schwartz is among the largest shareholders of Neuberger Berman Group LLC. As a shareholder, Schwartz personally profited from the fees he collected from the Fund and the Plan.

11.     Neuberger and its other shareholders also profited handsomely, receiving tens of millions of dollars in fees during the Class Period from the Plan's investment in the Fund.

12.     The fees for the Fund were 80 basis points ("bps"),[1] while comparable funds in the same asset class charged 2 bps if passively managed and 54 bps or less if actively managed.

13.     Defendants also engaged in prohibited transactions during the Class Period. Each time the Plan paid fees to Neuberger Berman Trust Company N.A. ("Neuberger Trust"), or other Neuberger entities, in connection with the Plan's investment in the Fund, Defendants caused the Plan to engage in a prohibited transaction under ERISA. The Fund is structured as a collective investment trust ("CIT"). Accordingly, the assets in the Fund are Plan assets.[2] Thus, whenever fees were paid from the Fund to

---

[1] One basis point is equal to 0.01%, so a fee of 80 basis points is 0.80% of the Fund's assets per year.
[2] In contrast, the assets in a mutual fund are not plan assets. A plan owns shares of a mutual fund, but not the underlying public securities held by the fund. But a plan has a direct ownership stake in the

Neuberger or an affiliate, the Defendants caused the Plan to engage in a transaction with Plan assets with a party (or parties) in interest, which is prohibited under ERISA.

14.     Specifically, the Plan engaged in a transaction prohibited by ERISA § 406(a), which prohibits Defendants from causing the Plan to transact with the plan sponsor, Neuberger, or any of its affiliates. Each time the Plan paid fees to any of these entities, the Plan also engaged in a transaction prohibited by ERISA § 406(b), which prohibits Defendants from causing the Plan to engage in a transaction benefiting a person, here Neuberger Trust and Schwartz, whose interests are adverse to the interests of the Plan and its participants and beneficiaries, and prohibits Neuberger from dealing with Plan assets in its own interest or for its own account.

15.     This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, 409, and 502(a)(2), 29 U.S.C. §§ 1104, 1106, 1109 and 1132(a)(2).

16.     Plaintiff brings this action on behalf of the Plan for losses to the Plan and for disgorgement of unlawful fees, expenses, and profits taken by Defendants, and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of Title I of ERISA.

17.     This class action is brought on behalf of participants in the Plan who participated from June 15, 2010 through the present (the "Class Period") and who invested in the Fund.

### III.  JURISDICTION AND VENUE

18.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of civil actions brought under Title I of ERISA.

---

securities held by a CIT such as the Fund.

19.    **Personal Jurisdiction.** This court has personal jurisdiction over Defendants because they reside and/or transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New York.

20.    **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is and was administered in New York, New York, within this District, the breaches of ERISA took place in this District, and/or a Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a Defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV. PARTIES

21.    Plaintiff Arthur Bekker is a resident of Westfield, New Jersey. He participated in the Plan during the entire Class Period, and is a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

22.    Plaintiff's individual account in the Plan was invested in various investment options offered under the Plan's investment menu in the Class Period, including the Fund. Plaintiff, like substantially all plan participants, was not provided any information regarding the substance of deliberations, if any, of Defendants concerning the Plan's menu of investment options or selection of service providers during the Class Period. Plaintiff otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments he selected in the Plan beyond what was provided to him by the Plan. Plaintiff discovered his claims shortly before commencing this action.

23.     The Neuberger Berman Group LLC 401(k) Plan Investment Committee (the "Investment Committee" or "Committee"), operating under the written Plan document, consists of at least three members appointed by the Board of Directors of Neuberger Berman Group LLC. The Investment Committee is the Named Fiduciary for the appointment of managers and the control or management of the assets of the Plan, except with respect to those matters which under the Plan or the Trust Agreement are the responsibility or subject to the authority of the Trustee or an investment manager. The Investment Committee may appoint an investment manager or managers to manage any assets of the Plan.

24.     Defendants Jane and John Does 1–25 are members of the Committee and/or Neuberger Executive Vice Presidents in charge of Human Resources during the Class Period, who are unknown to Plaintiff.

25.     Defendants are or in the Class Period were fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

26.     Non-party Neuberger Berman Group LLC, the Plan Sponsor, is a Delaware company with its principal place of business in New York, New York.

27.     Non-party Neuberger Berman LLC is also a Delaware company and is an indirect wholly owned subsidiary of Neuberger Berman Group LLC. Neuberger Berman LLC is a registered broker-dealer and registered investment adviser engaged principally in providing investment advisory services to individuals and institutions. Its principal place of business is also New York, New York.

28.     Non-party Neuberger Berman Trust Company N.A. is a wholly-owned subsidiary of Neuberger Berman Group LLC and is the trustee of the Fund (the "Trustee"). It maintains ultimate fiduciary authority over the management of, and investments made, in the Fund. Since April 18, 2011,

the Fund has been part of a Collective Investment Trust sponsored and maintained by Neuberger

Berman Trust Company N.A.  Neuberger Berman Trust Company N.A. is also a Delaware corporation

with its principal place of business in New York, New York.

29.    Non-party Marvin Schwartz is the lead manager of the Fund through the Straus Group at

Neuberger. Schwartz is Managing Director, Senior Portfolio Manager and Team Leader. Schwartz

joined Neuberger in 1961 and, with Philip Straus, established the Straus Group in 1967. His previous

roles at Neuberger include being a member of the Neuberger Berman Executive Committee, Director of

Neuberger Berman Management Co., and a member of the firm's Board of Directors. Schwartz is a part-

owner of Neuberger Berman Group LLC, the Vice Chairman of the Board of Directors of Neuberger

Berman Group LLC, Managing Director of Neuberger Berman Group LLC, and a resident of New York.

## V.    FACTS

### a.  The Plan and Administration of the Plan.

30.    The Plan is an employee benefit plan within the meaning of ERISA § 3(3), 29 U.S.C.

§ 1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C.

§ 1003(a).

31.    The Plan is also an "employee pension benefit plan" or "pension plan" as defined by

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account

plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

32.    The Plan covers eligible employees of Neuberger, including its domestic subsidiaries.

33.    Participants' investments in the Plan are allocated to their individual accounts, and the

return on those investments are credited to each participant's account.

34.    The Plan's benefits are funded by participants' voluntary tax-deferred contributions and

by employer matching contributions. The Plan is intended to qualify under Internal Revenue Code

§ 401(k), 26 U.S.C. § 401(k).

35.     The Plan was created on January 1, 2010 after the separation of Neuberger from Lehman Brothers. Participant account balances from the Lehman Brothers Savings Plan for employees of Neuberger who were active on January 1, 2010 were moved into the newly-created Plan, as were account balances for employees of Neuberger who had terminated from Neuberger prior to January 1, 2010, but who had balances in the Neuberger Berman Value Equity Fund. In addition, accounts for employees of the Lehman Trust Companies were moved into the Plan on July 15, 2010.

36.     The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2017 plan year the Plan had 2,592 combined participants and deceased participants with beneficiaries entitled to benefits. At that time, the Plan had $425,416,990 invested in the Fund, out of total Plan assets of $1,089,815,340.

37.     The Committee is responsible for selecting, monitoring, and removing the investment options in the Plan. The Committee's individual members are officers and/or employees of Neuberger and its affiliates. They are not independent of Neuberger.

38.     Neuberger is, and since December 2014 has been, 100% owned by Neuberger portfolio managers and senior professionals. Only about 20% of the employees of Neuberger are permitted to own shares of Neuberger. Prior to December 2014, Neuberger was owned by these high-level Neuberger employees as well as certain creditors of Lehman Brothers, from which Neuberger separated in 2009.

**b.  The Value Equity Fund**

39.     The Plan invested approximately half of its assets in the Fund over the Class Period. Neuberger Trust is the Trustee of the Fund and maintains fiduciary authority over the management of, and investments made in, the Fund. The Fund is part of a Collective Investment Trust (the "Trust") sponsored and maintained by the Trustee. The Trustee is a wholly-owned subsidiary of Neuberger.

40.     Prior to April 18, 2011, the Fund was a separately managed account managed by Schwartz and the Straus Group. It had been closed to new investments since 2003, after Neuberger's

predecessor plans were merged into Lehman Brother's defined contribution plan. Lehman Brothers prohibited participants from moving assets into the Neuberger Berman Value Equity Fund while it was in the Plan.

41.     In 2008, Schwartz had, by his own admission, a "cataclysmic year." His Value Equity holdings lost nearly 50% of their value, even though his stated benchmark, the S&P 500, lost only 37%.

42.     On April 18, 2011, following the separation of Neuberger from Lehman Brothers, and despite Schwartz's poor performance, Neuberger transferred the assets of the separate account into a collective trust and re-opened the Fund to new investments by Plan participants. The conversion not only permitted the Plan to invest additional assets in the Fund, but also allowed investors other than the Plan to invest in the Fund. Despite opening the Plan to unaffiliated investors more than seven years ago, the Plan continues to represent well over 90% of the assets in the Fund. Defendants converted the Plan's investment in the separate account version of the Fund to the collective trust version on the same date (the "Collective Trust Inception Date").

43.     Neuberger said the benchmark for the Fund is the S&P 500 Index. The S&P 500 Index is widely regarded as the standard for measuring the performance of U.S. large-cap stock funds and includes a representative sampling of leading companies in leading industries.

44.     As of December 31, 2010, when the Fund was still a separate account, the Plan's investments through the separate account consisted of 44 common stocks and a *de minimus* investment in a cash-equivalent fund for liquidity purposes. Nearly all stocks were companies included in the S&P 500.

45.     As of December 31, 2012, the 18 largest holdings of the Fund were all companies in the S&P 500 Index. Collectively, these 18 holdings represented 71.5% of the Fund's assets.

46.     As of June 30, 2016, the ten largest holdings of the Fund—the only holdings disclosed in the June 30, 2016 fact sheet—were all companies in the S&P 500 Index. Collectively, these ten holdings represented 51% of the Fund's assets.

47.     Accordingly, the S&P 500 Index is an appropriate benchmark of the Fund's returns.

48.     Defendant Schwartz has admitted that investors have a choice between his active management "and the associated fees or just buy an index."[3] Thus, Defendants should have compared the Fund to both actively and passively managed products with similar strategies of investing in large domestic stocks when evaluating performance, fees, and other factors involved in fulfilling their fiduciary responsibilities to the Plan.

49.     Actively managed equity funds, particularly those managed by Neuberger Berman, rarely outperform their benchmarks. For example, Neuberger's 2014 Annual Report notes that 71% of its equity investments failed to meet their benchmarks over the prior 5-year period and 74% failed to meet their benchmarks over the prior 3-year period. Thus, Defendants knew that Neuberger managed equity investments, like the Fund, are nearly three-times as likely to underperform their benchmark as they are to outperform it.

50.     Numerous managers offer investment products replicating the S&P 500 Index. For example, Vanguard offers large investors, like the Plan, the Institutional Index Fund Institutional Plus Shares (hereafter referred to by ticker symbol, "VIIIX"). That fund has matched the performance of the S&P 500 Index, less fees, over the past five years and charges a management fee of 2 bps, which means two one-hundredth of one-percent per year. Other managers, including State Street Global Advisors, also offer investments tracking the S&P 500 Index for 2 bps or less.

---

[3] http://citywireselector.com/news/marvin-schwartz-makes-bold-calls-after-poor-year/a340987

51.    Neuberger, in contrast, charges the Plan a fee 40 times higher (80 bps) than these widely available institutional products for the management of the Fund. These fees are paid to the Trustee, directly or indirectly, by the Plan. Based on year-end reported assets, the fees to Neuberger have been:

**TABLE 1**

| YEAR | ASSETS | FEE TO NEUBERGER | VIIIX FEE | EXCESS |
|---|---|---|---|---|
| 2010 | $278,027,414 | $2,224,219[4] | $55,605 | $2,168,614 |
| 2011 | $346,598,100 | $2,345,776 | $69,320 | $2,276,456 |
| 2012 | $349,244,108 | $3,582,934 | $69,849 | $3,513,085 |
| 2013 | $428,841,242 | $3,841,771 | $85,768 | $3,756,003 |
| 2014 | $444,451,094 | $4,018,322 | $88,890 | $3,929,432 |
| 2015 | $376,997,023 | $3,015,976 | $75,399 | $2,940,577 |
| 2016 | $402,950,081 | $3,223,600 | $80,590 | $3,143,010 |
| 2017 | $425,416,990 | $3,403,336 | $85,083 | $3,318,253 |
| Total | | $25,655,934 | $610,505 | $25,045,429 |

52.    Thus, Neuberger received at least $25 million in fees even though comparable large-cap funds would have charged the Plan radically less — under $620,000 versus $25,655,934 over the past eight years.

53.    The Fund fees were also excessive compared to actively managed mutual funds with similar investment philosophies and strategies.

54.    The Investment Company Institute, a mutual fund trade group, reports that the median mutual fund expense ratio in comparably sized 401(k) plans among domestic equity funds was 0.52% in

---

[4] Estimated.

2015.[5] As a result, the Fund was 54 percent more expensive than the median comparable fund.

Similarly, the weighted average fees for the cheapest share class of actively managed mutual funds

reported by Morningstar in both the large-cap blend and large-cap value strategies was 48 basis points in

2017 — making the Fund 66 percent more expensive under that benchmark.

55.    As shown below, the ten largest actively managed domestic equity funds in the United

States[6] all charge significantly lower fees to investors than the Fund, and all have been less costly than

the Fund over the entire Class Period.[7]

**TABLE 2**

| Fund | Ticker | Net ER 2018 | Highest Net ER During Class Period | AUM | VEF excess fee |
|---|---|---|---|---|---|
| Amer. Funds Fundamental | RFNGX | 0.30% | 0.32% | $101.4 bil. | 166.67% |
| Amer. Funds Investment Co of Amer. | RICGX | 0.30% | 0.30% | $97.4 billion | 166.67% |
| Oakmark Fund | OANMX | 0.68% | 0.68%[8] | $21.6 billion | 17.65% |
| Franklin Rising Dividends Fund | FRISX | 0.54% | 0.54% | $19.9 billion | 48.15% |
| Parnassus Core Equity Fund | PRILX | 0.64% | 0.75% | $17.0 billion | 25.00% |
| JP Morgan US Equity | JUESX | 0.75% | 0.79% | $15.9 billion | 6.67% |
| Columbia Contrarian Core | COFYX | 0.64% | 0.72% | $11.6 billion | 25.00% |
| Vanguard Growth and Income | VGIAX | 0.23% | 0.26% | $11.4 billion | 247.83% |
| Davis New York Venture Fund | DNVYX | 0.63% | 0.64% | $11.2 billion | 26.98% |
| PRIMECAP Odyssey Stock Fund | POSKX | 0.67% | 0.71% | $11.1 billion | 19.40% |

56.    Although the Fund benchmarked against the S&P 500 Index, and had the investment

objective to "provide capital return opportunities afforded by the equity market," the Fund also stated

---

[5] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015, published March 2018, at pg. 69.
[6] As reported by Fidelity Investments in 2018.
[7] "ER" or "Expense Ratio" represents the annual fee of investing in each option.
[8] Morningstar.com, the source of current and historical expense information in this table, does not report historical expense ratios for the Oakmark Fund. For the Oakmark Fund the current net expense ratio was obtained from the fund's prospectus, available at: https://www.oakmark.com/Oakmark-files/prospectus/Oakmark_Prospectus.pdf

that it applied "principles of value investing to select investments," a strategy shared by the funds below.
The fee difference is even more significant.

**TABLE 3**

| Fund | Ticker | Net ER 2018 | Highest Net ER During Class Period | AUM | VEF excess fee |
|------|--------|-------------|-------------------------------------|-----|----------------|
| Amer. Funds Washington Mutual | RWMGX | 0.29% | 0.37% | $109.4 bil. | 175.86% |
| Dodge & Cox Stock Fund | DODGX | 0.52% | 0.52% | $74.8 billion | 53.85% |
| American Funds American Mutual | RMFGX | 0.30% | 0.33% | $52.1 billion | 166.67% |
| Vanguard Windsor II | VWNAX | 0.26% | 0.28% | $49.6 billion | 207.69% |
| MFS Value Fund | MEIKX | 0.49% | 0.83% | $48.6 billion | 63.27% |
| Vanguard Equity-Income Fund | VEIRX | 0.17% | 0.22% | $33.4 billion | 370.59% |
| T.Rowe Price Value Fund | TRPIX | 0.63% | 0.66% | $25.5 billion | 26.98% |
| Invesco Diversified Dividend Fund | LCEFX | 0.42% | 0.49% | $21.5 billion | 90.48% |
| Blackrock Equity Dividend Fund | MKDVX | 0.60% | 0.60% | $21.5 billion | 33.33% |
| Vanguard Windsor Fund | VWNEX | 0.21% | 0.29% | $20.3 billion | 280.95% |
| JPMorgan Equity Income Fund | OIEJX | 0.50% | 0.54% | $18.8 billion | 60.00% |

57.    Thus, whether measured against actively managed large cap blend funds tracking the
S&P 500, or large cap value funds (which typically benchmark against the Russell 1000 Value index), or
index funds investing in the same stocks, the Fund was more expensive than all of the most popular
alternatives in each category. Specifically, on average the Fund was 75% more expensive than the
average of the ten largest actively managed large cap blend funds, 139% more expensive than the
average of the eleven largest actively managed large cap value funds, 48% more expensive than the
median fee charged by domestic equity funds in comparable 401(k) plans, and 66% more expensive than
the average fee investors pay for actively managed large-cap blend or large-cap value funds in the
overall investment marketplace. The Fund was even more expensive than the most expensive each fund
above has *ever* been during the *entire* Class Period. During the six-month period when the MFS Value
Fund charged fees of 83 bps, the VEF actually charged 100 bps. Dkt. 25-2 at ECF 2.

58.     The Fund is also more expensive than Neuberger-managed mutual funds offered to the general public. The Fund is more expensive than both Neuberger's Value Fund and Neuberger's Large Cap Value Fund. Both of these funds have consistently outperformed the Fund and neither is managed by Mr. Schwartz.

59.     The Fund is also more expensive than similarly-structured institutional accounts managed by Neuberger and offered in the marketplace. Neuberger's public filings indicate that management fees charged by Neuberger on actively managed separate accounts in the Large Cap Core and Large Cap Value asset classes are charged fees on a declining fee schedule of 65 bps on the first $25 million, 50 bps on the next $25 million, 40 bps on the next $50 million, 30 bps on the next $100 million, and 25 bps on the balance.[9]

60.     As the Plan's investment in the Fund averaged approximately $400 million during the Class Period, fees under this market-priced fees schedule would have been $1,287,500 (32 bps) per year instead of $3,200,000 (80 bps) per year. Thus, Neuberger charged the Plan nearly three times the fees charged to unaffiliated investors for institutional large cap active management.

61.     The Value Equity Fund appears to be a vehicle for bilking Neuberger employees, who represent 90% of the asset in the Fund, rather than a product marketed to the general public.

62.     During and before the Class Period, the Fund dramatically underperformed the S&P 500 Index and similar investible products such as VIIIX.[10] For the ten-years ending on June 30, 2016, the

---

[9] Fee table is found on Page 19 of Neuberger Berman Investment Advisers LLC Client Brochure, dated March 29, 2018, and available at: https://adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=5042 45

[10] Index funds are a valid comparable investment to actively managed funds because they are products available in the market that track the indices against which actively managed funds are benchmarked. Indeed, Morningstar includes index funds in its peer group averages.

Fund had an *annualized* return of 2.97% while the S&P 500 Index and VIIIX had annualized returns of 7.45%.[11]

63.    The underperformance has been accelerating. For the five years ending on June 30, 2016, the Fund had an annualized return of 4.7% while the S&P 500 Index and VIIIX had annualized returns of 12.1% and the median actively-managed large cap domestic equity blend mutual fund had annualized returns of 10.92%. Among actively-managed large cap domestic equity value mutual funds, median 5-year returns were 10.10% and the Neuberger Berman Large Cap Value Fund and the Neuberger Berman Value Fund had annualized returns of 7.01% and 9.32% respectively. Meanwhile, during the 1-year ending June 30, 2016, the Fund lost 10.15% while the S&P 500 and VIIIX gained 4%, a difference of over 14% in a single year.

**TABLE 3**

| Fund | 1-year | 3-year | 5-year | 10-year |
|---|---|---|---|---|
| Neuberger | -10.2% | 2.9% | 4.7% | 3.0% |
| Vanguard | 4.0% | 11.7% | 12.1% | 7.4% |
| **Difference** | **-14.2%** | **-8.8%** | **-7.4%** | **-4.4%** |

64.    While the Fund underperformed compared to the average returns of its Morningstar-reported peers, the large cap alternative funds discussed above generally outperformed peers. Of the ten largest large cap blend funds identified in Paragraph 55, only one, the Davis New York Venture Fund, failed to outperform its Morningstar category average during the period June 30, 2010 to October 4, 2018. Of the eleven largest large cap value funds identified in Paragraph 56, only one, the Invesco

---

[11] Neuberger Berman Group LLC itself invests in various Vanguard Funds, including the Vanguard S&P 500 ETF.

Diversified Dividend Fund, failed to outperform its Morningstar category average during the same period.

65.    With approximately $350 million of Plan assets in the Fund over the past five years, this underperformance cost the Plan $26 million *per year* in lost returns. For the past five years alone, that sum adds up to $130 million in losses to the Plan.

66.    Nevertheless, the Fund remains in the Plan to this day.

**c.    Neuberger and its Officers and Senior Managers Benefit from the Fund's continued inclusion in the Plan.**

67.    The Fund continues in the Plan because Defendants have breached and continue to breach their fiduciary obligations to remove the Fund.

68.    The Fund is managed by the Straus Group, a Neuberger team lead by Managing Director, Senior Portfolio Manager and Team Leader Marvin Schwartz. Schwartz joined Neuberger in 1961 and, with Philip Straus, established the Straus Group in 1967. His previous roles at Neuberger include being a member of the Neuberger Berman Executive Committee, Director of Neuberger Berman Management Co., and a member of the firm's Board of Directors.

69.    Neuberger is 100% management-owned. Upon information and belief, this includes Schwartz and other managers who benefit financially from the continued inclusion of the Fund in the Plan, and any additional success the Fund has in the marketplace, through their positions as significant shareholders in Neuberger.

70.    Upon information and belief, Schwartz and other managers also benefit financially from the continued inclusion of the Fund in the Plan and any additional success the Fund has in the marketplace because some or all of their compensation is determined by the assets they have under management and the profit generated from those assets.

**d. The Fund has Failed in the Market.**

71.    The Plan was the first and largest investor in the Fund. During the relevant time period the Plan has represented between 93 and 96 percent of the assets in the Fund. As of December 31, 2017, Neuberger reports that the Value Equity Fund had $456,754,470 in total assets, of which $425,416,990 were Plan assets. Before the Fund was converted to a CIT, Neuberger could not open and market the Fund to unaffiliated plans and investors. Defendants used the retirement assets of Neuberger employees to seed a new investment product, the Value Equity Fund Collective Trust, to make the Fund marketable to outside investors and increase profits for Neuberger and Schwartz. In fact, the Fund has been almost universally rejected by other 401(k) plans—despite, presumably, Neuberger's efforts to pitch the Fund to unaffiliated investors. Collectively, other investments in the Fund represented less than 7 percent of the total Fund during the Class Period.

72.    Most of the other investors in the Fund have direct business or personal relationships with Neuberger and Schwartz. Weil, Gotshal & Manges LLP, for example, included the Fund in its 401(k) retirement plan.[12] Weil represented the parties in the separation of Neuberger from Lehman Brothers's investment management business. GoldenTree Asset Management includes the Fund in its retirement plan, but the President of GoldenTree, Robert Matza, was hired from Neuberger, where he had been President and COO. Prior to Mr. Matza joining GoldenTree, the Fund was not in GoldenTree's Plan. MUFG Fund Services (USA) LLC did not invest in the Fund until 2016, on information and belief, after it reached a deal in February 2016 to acquire Neuberger's private equity fund administration business, Capital Analytics. Although the terms of that acquisition were not disclosed, the Fund was added to the MUFG 401(k) plan later that year.

---

[12] Although the Fund's Form 5500, filed with the Department of Labor, identifies the WGM Master Trust as an investor in the Fund, the Master Trust itself does not identify the Fund as one of its investments in its Form 5500 filing. However, Weil, Gotshal & Manges LLP Section 401(k) Savings and Investment Plan shows a $6.2 million holding in the Fund as of December 31, 2017.

73.     Occidental Petroleum, which has no obvious relationship to Neuberger, added the Fund to its 401(k) plan in 2015. Occidental eliminated the fund in 2018, only three years later. Occidental Petroleum replaced the fund with an index fund that, like the Fund, invests in large U.S. companies.

74.     Although Neuberger identified Jefferies Group LLC Employees' Profit Sharing Plan in its 2016 Form 5500 filing with the Department of Labor, Jefferies Group's 2016 Form 5500 does not identify the Fund as one of its investments and Neuberger's 2017 Form 5500 no longer identifies the Jefferies plan as an investor in the Fund. The last recorded time the Fund was included in the Jefferies Group LLC Employees' Profit Sharing Plan was November 30, 2015, when the plan had $46,183 of its $405 million in assets invested in the Fund.

75.     Only two other companies have placed benefit plan assets in the Fund — Kane-Miller Corporation, and Ophthalmic Consultants, P.C. Those plans are extremely small. Neither plan has more than 30 participants or $7 million in total assets (only a fraction of which would be in the Fund), so they do not have access to alternatives available to fiduciaries to enormous 401(k) plans, like the Plan. Neither plan had sufficient assets to qualify for VIIIX or any of the other alternatives identified in this Complaint.

**e.  The Committee Failed to Apply Its Removal Policy for Poor Performing Funds to the Fund, but Applied it to Unaffiliated Funds.**

76.     "Most plans adopt an investment policy statement (IPS) to guide their investment decisions."[13]

77.     The Plan's IPS noted that actively-managed options included in the Plan must be "expected to provide for returns higher than their respective market indices." Doc. 24-2 at ECF 8. The

---

[13] https://www.nb.com/pages/public/en-us/insights/white-label-funds-simplifying-the-plan-investment-menu-in-an-effort-to-enhance-participant-outcomes.aspx

IPS further directs the Committee to review performance using three-year histories and remove underperforming funds. *Id*. at ECF 10–11.

78.    Defendants removed two non-proprietary mutual funds from the Plan during the Class Period. The PIMCO Total Return Fund was removed in 2014 and the Virtus Emerging Markets Opportunities Fund was removed in 2016.

79.    The PIMCO Total Return Fund was terminated after failing to outperform its peer group during two of the prior three years. However, during the five years prior to Defendants' removal of the PIMCO Total Return Fund, that fund had underperformed its Morningstar category average only three times (2009, 2011, and 2013) and had, on average, slightly outperformed its category average over the full five-year period. Nevertheless, after three years of underperformance, consistent with the IPS, Defendant removed the PIMCO Total Return Fund from the Plan.

80.    The PIMCO Total Return Fund has $70 billion in assets, demonstrating its widespread acceptance by the marketplace, unlike the VEF.

81.    Likewise, the Virtus Emerging Markets Opportunities Fund was removed after underperforming its benchmark by 304 bps and its Morningstar peer group by 704 bps during 2016. In 2015 the Virtus Fund had outperformed its peer group but underperformed its benchmark index. During 2014, the Virtus Fund had exceeded its benchmark by 941 bps and its peer group by 855 bps, ranking it among the top 3% of all emerging markets funds for the year. As with PIMCO, the Fund had outperformed its category average over the full five-year period. Nevertheless, Defendant removed the Virtus Emerging Markets Opportunities Fund from the Plan.

82.    The Virtus Emerging Markets Opportunities Fund has $7.3 billion in assets, demonstrating its wide acceptance in the marketplace, unlike the Value Equity Fund.

83.     During the five years ending June 30, 2017 (Defendants stopped publishing returns of the Fund after that date) the VEF underperformed its benchmark by over 4% per year, which is also true looking back three years or ten years. The Fund has only $434 million in assets, nearly all of which are from the Plan. During the first six months of 2017 alone, the Fund underperformed its benchmark by over 6%, but it remains in the Plan today.

84.     Thus, Defendants failed to follow their own IPS with respect to the poor-performing, and immensely profitable for Neuberger, VEF, but did follow their IPS with respect to removing unaffiliated funds for poor performance.

85.     By comparison, and as shown below, whether measured against investible alternatives tracking the S&P 500 or the Russell 1000 Value Indexes, the Fund's three-year performance has been below the respective benchmark during any 3-year period since at least June 2014 (three years after the Fund became a collective trust).

**FIGURE 1**



86.     Similarly, the Fund has underperformed Morningstar's reported category average returns for mutual funds in both the large-cap blend and large-cap value category. As shown below, the Fund's three-year performance has been below the respective benchmark during any 3-year period since the fourth quarter of 2014.

**FIGURE 2**



87.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. In short, the Fund was more expensive than typical funds with the same investment philosophies and strategies. It underperformed its benchmark, benchmark index funds, peer group averages, and actively managed marketplace alternatives over virtually all time periods. It was more expensive and lower performing than comparable actively managed funds managed by Neuberger, but those alternatives were not included in the Plan. It failed to meet the performance criteria Defendants codified in the Investment Policy Statement. While two non-proprietary funds were removed after their three-year trailing performance failed to meet benchmark index returns, the Fund remained in the Plan despite failing to meet the same performance throughout virtually the entire Class Period. The only

plausible explanation is that the Fund was selected and maintained in the Plan to enrich Neuberger and its owners.

## VI. ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

88.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —

(A)        for the exclusive purpose of:

(i)        providing benefits to participants and their beneficiaries; and

(ii)        defraying reasonable expenses of administering the plan; [and]

(B)        with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)        by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

89.    ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

90.     Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

91.     As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

92.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable….

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

93.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in

23

> deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The Department of Labor has

repeatedly warned:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits Security Admin.

(Feb. 2012), http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

94.    In a separate publication, the Department of Labor writes:

> The Federal law governing private-sector retirement plans, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

> * * *

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

> * * *

> By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are

> assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security

Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

95.     The duties of prudence and loyalty under ERISA are derived from the common law of

trusts.

96.     Under the common law of trusts, if a fiduciary "cannot prevent the existence of the

conflict of interest … he can immediately remove it." G. Bogert, G. Bogert & A. Hess, The Law of

Trusts and Trustees § 543 (3d ed. 2015) (also, "Perhaps the most fundamental duty of a trustee is that he

must display throughout the administration of the trust complete loyalty to the interests of the

beneficiary and must exclude all selfish interest and all consideration of the interests of third persons.")

97.     The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104,

are supplemented by a detailed list of transactions that are expressly prohibited by ERISA § 406,

29 U.S.C. § 1106, and are considered "per se" violations because they entail a high potential for abuse.

Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
>
> transaction, if he knows or should know that such transaction constitutes a direct or
>
> indirect —
>
> (A)     sale or exchange… between the plan and a party in interest;
>
> *        *        *
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in
>
> interest;

> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets
> of the plan….

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not —
>
> (1)    deal with the asset of the plan in his own interest or for his own account,
>
> (2)    in his individual or in any other capacity act in a transaction involving the plan
> on behalf of a party (or represent a party) whose interests are adverse to the
> interest of the plan or the interest of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with
> such plan in connection with a transaction involving the assets of the plan.

98.    ERISA's prohibited transaction provisions thus prohibit fiduciaries, such as the

Defendants here, from causing plans to engage in transactions with the plan sponsor, here Neuberger,

including causing the plan to invest assets in the investment management products offered by a party in

interest or plan fiduciary and the payment of investment management or other fees in connection with

such investments.

99.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides a cause of action against a party in

interest, such as Neuberger, for participating in the breach of a fiduciary.

100.    ERISA § 405(a), 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary, such

as Neuberger, for knowingly participating in a breach by another fiduciary and knowingly failing to cure

any breach of duty.

101.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary

with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on

fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan

resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VII. CLASS ALLEGATIONS

102.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of a plan to recover for the plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

103.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of the following class (the "Class"):

> All participants in the Neuberger Berman Group 401(k) Plan from June 15, 2010 to the date of judgment who invested any portion of their Plan accounts, at any time during the class period, in the Neuberger Berman Value Equity Fund. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families, and legal representatives, successors, and assigns of any such excluded persons.

104.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(a)    The Class satisfies the numerosity requirement of Rule 23(a) because it is composed of over one thousand persons, in numerous locations. The number of Class members is so large that joinder of all its members is impracticable.

(b)    The Class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in the Fund and by failing to prudently remove the Fund from the Plan; whether the decision to include and not to remove the Fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; whether Defendants caused the Plan to engage in prohibited transactions; whether monies received and retained by a Defendant were plan assets; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(c)     The Class satisfies the typicality requirement of Rule 23(a) because Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was and remains an investor in the Fund for the entirety of the Class Period.

(d)     The Class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(e)     Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also

warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

(f)    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(g)    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.    CLAIMS FOR RELIEF

### Count 1: Breach of Fiduciary Duty
### ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)

105.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

106.    Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

107.    Defendants caused the Plan to invest hundreds of millions of dollars in the Fund, favoring the proprietary investment options of the Neuberger organization.

108.    Defendants collected excessive and unnecessary fees from the Plan and the Fund.

109.    Defendants failed to remove the Fund even though a prudent fiduciary would have done so given the Fund's high fees and overwhelmingly poor performance.

110.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

111.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

112.    As a direct and proximate result of these breaches of fiduciary duty, the Plan and its participants have paid Neuberger, directly and indirectly, substantial excess investment management, trustee, and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## Count 2: Prohibited Transactions
### ERISA § 406, 29 U.S.C. § 1106

113.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

114.    This Count alleges prohibited transactions against the Defendants.

115.    Defendants are fiduciaries and parties in interest to the Plan.

116.    Defendants caused the Plan to engage in a prohibited transaction under ERISA with each payment by the Plan of fees to Neuberger and Neuberger Trust in connection with the Plan's investment in the Fund.

117.    By the conduct and omissions described above, the Defendants failed to discharge their duties with respect to the Plan.

118.    In Neuberger's collection of fees from the Plan as a result of the Plan's investment in the Fund, both before and after the Collective Trust Inception Date, Defendants caused the Plan to engage in transactions that they knew or should have known constitute the direct or indirect sale or exchange of property between the Plan and a party in interest, in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A); and

119.    In Neuberger's collection of fees from the Plan as a result of the Plan's investment in the Fund, both before and after the Collective Trust Inception Date, Defendants caused the Plan to engage in transactions that they knew or should have known constitute the direct or indirect furnishing of goods or services between the Plan and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

120.    In Neuberger's collection of fees from the Plan as a result of the Plan's investment in the Fund, including subsequent payments to Schwartz as a result of the Plan's investment in the Fund, both before and after the Collective Trust Inception Date, Defendants caused the Plan to engage in transactions that they knew or should have known constitute the direct or indirect transfers of the Plan's assets to, or use of the Plan's assets by or for the benefit of, parties in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and

121.    In Defendants' causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the Plan in its own interest or for its own account, ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), was violated; and

122.    By causing the Plan to engage in the above conduct and omissions, Defendants, in their individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

123.    By Defendants' receiving consideration for their own personal accounts from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), was violated.

124.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and to restore all losses suffered by the Plan caused by their breaches of duty.

**IX.    JURY TRIAL**

125.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiff demands a trial by jury for those issues so triable.

**X.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    A declaration that the Defendants breached their fiduciary duties under ERISA § 404 and violated ERISA § 406 by causing the Plan to engage in prohibited transactions;

B.    An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Neuberger and its affiliates by the Plan, including disgorgement of profits thereon;

C.      An order compelling the Defendants to make good to the Plan all losses to the Plan resulting from their breaches of their fiduciary duties and prohibited transactions, including lost-opportunity costs;

D.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

E.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in Neuberger and affiliated entities' funds;

F.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

G.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and pre-judgment and post-judgment interest; and

I.      An order awarding such other and further relief as the Court deems equitable and just.

Dated: May 24, 2019                     Respectfully submitted,

                                        s/ Gregory Y. Porter___
                                        Gregory Y. Porter (*pro hac vice*)
                                        Kevin W. Barrett (NY Bar # 2196343)
                                        Ryan T. Jenny (*pro hac vice*)
                                        Mark G. Boyko
                                        BAILEY & GLASSER LLP

1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
kbarrett@baileyglasser.com
rjenny@baileyglasser.com
mboyko@baileyglasser.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2019 a copy of the foregoing was filed with the Court. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gregory Y. Porter
Gregory Y. Porter, *pro hac vice*